1. The defendant was convicted of the alleged murder of Leroy Hill by intentionally administering to him poisons, which he did swallow and take internally and which did cause and produce his death on February 13, 1946. The defendant's motion for a new trial as amended was overruled, and she excepted. The evidence, though circumstantial in nature — relating, among other things, to conduct and statements of the defendant before and after the death of the deceased (husband of the defendant), medicine given to him by the defendant, his complaints and symptoms during his illness, and conditions found in his vital organs on autopsy — authorized a finding that the defendant killed the deceased by poisoning him with arsenic, and was sufficient to support the material allegations of the indictment. It also authorized a finding that the motive of the defendant was the collection of insurance which had been issued upon the life of the deceased, in favor of the defendant as beneficiary.
2. It also appeared from the evidence that the defendant's father and mother died on April 3 and July 13, respectively, in 1945, and that after the death of the defendant's husband the bodies of the parents were exhumed and vital organs of each were examined. The evidence further authorized a finding that each of them died of arsenic poison intentionally administered by the defendant, as in the case of her husband, and that her acts with respect to them were prompted by the same motive, to wit, collection of life insurance. *Page 693 
3. In special grounds 3 to 11 inclusive of her motion for new trial, the defendant assigned error upon the admission of evidence touching the circumstances and causes of the deaths of her parents, over the objection that such evidence tended to establish independent crimes and was irrelevant, immaterial, and prejudicial, the defendant being on trial only for the alleged killing of Leroy Hill. Held:
(a) Evidence of the commission of one crime is not admissible on the trial of the defendant for another crime, where the sole purpose is to show that the defendant is guilty of such other crime; but such evidence is admissible where there is some logical connection between the two from which it can be said that proof of the one tends to establish the other. Cawthon v. State, 119 Ga. 395 (5) (46 S.E. 897); Wilson v. State, 173 Ga. 275 (2) (160 S.E. 319); Barkley v. State, 190 Ga. 641 (2) (10 S.E.2d 32).
(b) The evidence objected to, being of the general nature indicated in paragraph 2 above, was relevant for the purpose of showing plan, scheme, and motive with respect to the crime charged, and the court did not err in admitting it. See generally, in this connection, Code, § 38-202; Suber v. State, 176 Ga. 525 (1) (168 S.E. 585); Tucker v. State, 180 Ga. 87 (1) (178 S.E. 152); Emmett v. State, 195 Ga. 517 (3) (25 S.E.2d 9); Andrews v. State, 196 Ga. 84 (4) (26 S.E.2d 263); Fuller v. State, 197 Ga. 714 (1) (30 S.E.2d 608).
4. In a felony case, as distinguished from civil and misdemeanor cases, it is not error for the court to refuse a motion to purge the jury as to disqualification before beginning to select a jury for trial of the case, the statutes on the subject as applied to felony cases being different from those in reference to civil and misdemeanor cases. As to the former, see Code, §§ 59-801, 59-802, 59-804, 59-806; as to the latter, Code §§ 59-704, 59-705. In felony cases, the question as to competency and impartiality is one to be determined after the process of selecting a jury has commenced; and, after verdict, it is the disqualification itself, if it exists, and not the refusal to purge the entire panel at the beginning, of which complaint may be made. See, in this connection, Carter v. State, 106 Ga. 372 (6) (32 S.E. 345, 71 Am. St. R. 262); Whitworth v. State, 155 Ga. 395 (1) (117 S.E. 450); Atlanta Coach Co. v. Cobb, 17S Ga. 544, 555 (174 S.E. 131); Dees v. State, 41 Ga. App. 321 (1) (152 S.E. 913). While such preliminary inquiry is frequently made, "and is doubtless a salutary practice, it is not a right which is given by law to the defendant" in a felony case. Atlanta Coach Co. v. Cobb, supra.
(a) It follows that the court did not err in refusing a request of the defendant's counsel, made before selection of the jury had begun, to purge the jury and to declare disqualified any and all jurors who may have held policies in or who may have been employed by a named mutual insurance company, in which the defendant's father held a policy payable to her and the proceeds of which she collected after his death, and to which same company, as the evidence tended to show, she had caused her husband to apply for insurance upon his own life (which, however, was never issued).
5. Nor did the court err in refusing to grant a new trial upon the alleged *Page 694 
ground that two of the jurors who tried the case were disqualified for reasons indicated in paragraph 4 (a), supra, since the only attempted proof in support of such alleged disqualification consisted of affidavits of the jurors themselves, and the verdict which they had returned could not be impeached by them. Code, § 110-109; Bowden v. State, 126 Ga. 578 (1) (55 S.E. 499); Atlanta Coach Co. v. Cobb, 178 Ga. 544, 552, (174 S.E. 131); Peagler v. Huey, 183 Ga. 677 (3) (188 S.E. 906); Thompson v. State, 4 Ga. App. 649 (5) (62 S.E. 99); McCarty v. Mobley, 14 Ga. App. 225 (1) (80 S.E. 523); Cobb v. Atlanta Coach Co., 46 Ga. App. 633 (168 S.E. 126).
(a) Since, as ruled above, jurors by whose affidavits the defendant sought to prove the claimed disqualification could not thereby impeach their verdict, no ruling is necessary and none is made as to whether jurors holding policies in such insurance company, or related to policyholders, would have been disqualified under the facts of the case.
6. The rulings made in paragraph 4, supra, accord with the decision in Gossett v. State, 201 Ga. 809
(41 S.E.2d 308), as it was not held therein that the mere refusal to purge the jury at the outset without proof of actual disqualification would constitute error, although this court did then overlook the fact that the claimed disqualification of the juror as urged after the verdict was shown only by affidavit of the juror himself. Nor is that decision, though rendered upon a former writ of error brought by this same defendant, applicable as the law of the case to the matters herein dealt with, involving new and different facts, to wit, a different insurance company and different jurors. See, in this connection, Morrison v. Slaton, 148 Ga. 294 (1) (96 S.E. 422); Lumbermen's Mutual Casualty Co. v. Cook, 195 Ga. 397, 401 (24 S.E.2d 309).
7. Special ground 12 alleged that the court erred in permitting the solicitor-general to ask a named witness, a physician who qualified as an expert, the following hypothetical question: "If the cause of these toxic changes had been arsenic or some arsenic compound, from what you saw from your examination, was it possible or probable that the amounts and distribution of it indicated whether the poison had been ingested or received into the mouth, or was it taken intravenously?" and in permitting the witness to answer: "From what I saw, assuming, according to your hypothetical question, that it was arsenic poison, I would say that it was ingested, definitely."
The movant objected to such evidence on the ground that the witness had stated that he did not and could not state what caused the condition that he saw, and "thereby it would be a conclusion based on no facts' that the witness had in his possession, and there being no evidence that any arsenic was found. Held, that if the evidence was subject to the objection made thereto at the time it was offered, the error in admitting it was later cured when another witness testified that he made an examination of the contents of the organs of the body of Leroy Hill after his death, and that "large quantities of arsenic were found, the greatest concentration being in the wall of the stomach. Although the last-mentioned witness had also qualified as an expert, his testimony as to finding large quantities of arsenic was given as a matter of fact and not of opinion. Accordingly, there is no merit in ground 12. Shaw v. Jones, 133 Ga. 446 (5) (66 S.E. 240); Wilson v. State, 190 Ga. 824, 830 (5) (10 S.E.2d 861); Wigmore on Evidence, Vol. II, section 672. *Page 695 
(a) The conclusion just stated is not in conflict with Walker
v. Fields, 28 Ga. 237 (2), to the effect that an expert may give an opinion as to facts testified to by others, but not as to their opinions.
8. Special ground 13 shows that counsel for the defendant moved for a mistrial because of a statement made by an attorney for the State in the concluding argument before the jury, in connection with which the following colloquy occurred: Defendant's Attorney: "He said, `She killed Leroy Hill.'" State's Attorney: "`You have killed Leroy Hill.'" The Court: "You are arguing your contentions about the evidence." State's Attorney: "I stated in my argument, `You have killed Leroy Hill.' That is what the evidence discloses to my mind." Defendant's Attorney: "He didn't say that at the time I made my motion." The Court: "You counsel don't seem to agree." State's Attorney: "I am not testifying. I could testify."
It is complained that the court not only refused to declare a mistrial, but also failed to rebuke the State's attorney or to instruct the jury to disregard the remark or remarks made by him. There is no merit in these contentions. "In a prosecution for a homicide, a statement by the prosecuting attorney in his argument, expressive of his opinion of the defendant's guilt, should be construed to mean that the testimony led him to this conclusion, and that the jury should reach the same conclusion. In the absence of anything to the contrary, the solicitor's remarks will be regarded as a deduction from the evidence. . . What the law condemns is the injection into the argument of extrinsic and prejudicial matters which have no basis in the evidence." Floyd v. State, 143 Ga. 286 (5), 289 (84 S.E. 971). Under this rule as applied to the facts, the court did not err in refusing to declare a mistrial or in failing to take other action, as shown in ground 12.
(a) In the instant case, the statement of the attorney as first made to the jury (whether in the language claimed by him or in slightly different language as contended by the attorney for the defendant), and as later explained to the court in the presence of the jury, was materially different from the statements considered and dealt with in the following decisions cited for the plaintiff in error: Broznack v. State, 109 Ga. 514 (3) (35 S.E. 123); Butler v. State, 142 Ga. 286 (11) (82 S.E. 654); Johnson v. State, 150 Ga. 67 (1) (102 S.E. 439); Georgia Power Co.
v. Puckett, 181 Ga. 386 (182 S.E. 384); Forster v. State, 60 Ga. App. 598 (4 S.E.2d 498).
9. The following charge to the jury, "You, as the jury in the trial of this case, are not responsible for the consequences of your verdict. You are responsible for the truth of your verdict," was not erroneous, as insisted, because it was unnecessary, prejudicial, and injurious, in that it intimated to the jury that the court considered the defendant guilty, and that they should show no hesitancy in so declaring her. See, in this connection, Marshall v. State, 74 Ga. 26
(2); Billingsley v. State, 193 Ga. 711 (3) (19 S.E.2d 915); Campbell v. State, 202 Ga. 705
(6) (44 S.E.2d 903).
10. The evidence authorized the verdict, and none of the grounds of the motion for a new trial showing reversible error, the court did not err in overruling the motion. *Page 696 
Judgment affirmed. All the Justices concur, except Duckworth, P. J., and Wyatt and Head, JJ., who dissent.
 No. 16054. May 17, 1948.
Bertha Gossett, alias Bertha Gossett Hill, was indicted for murder, in Floyd County, in the alleged killing of Leroy Hill by poisoning him. After a verdict of guilty, this court reversed the judgment of the trial court refusing a new trial, because of alleged error relating to the disqualification of a juror.Gossett v. State, 201 Ga. 809. Upon a second trial a verdict of guilty was returned with a recommendation of mercy. The defendant made a motion for a new trial on the usual general grounds, to which were later added by amendment fourteen special grounds. The motion as thus amended was overruled, and the defendant excepted.
It appeared from the evidence introduced by the State that the deceased was the husband of the defendant, and that a policy of insurance on his life was issued by State Mutual Insurance Company for $2500, dated November 28, 1945, payable to the defendant; also that a policy for $3000 payable to the defendant was issued on his life by Liberty National Life Insurance Company, dated January 30, 1946. The deceased died on February 14, 1946. It appeared that, as to both of these policies, representatives of the insurance companies were first contacted by the defendant, after which agents obtained applications from the deceased on which the policies were issued. It is not clear from the evidence whether the premium on the State Mutual policy was paid at the time the application was made, or at the time the policy was delivered to the defendant. The premium on the policy issued by the Liberty National was paid at the time the application was made. An employee of the latter company testified that she received several calls from Mrs. Leroy Hill, and her chief concern seemed to be whether or not the binding receipt which she held for the policy would put it in force before the policy was issued. It also appeared that, at the instigation of the defendant, application was made by the deceased on December 6, 1945, for a $3000 policy in the Metropolitan Life Insurance Company payable to the defendant as beneficiary, but he did not report for medical examination and the policy was never issued. *Page 697 
The deceased died on the morning of February 14, 1946. It appears that he was sick and confined to his room from February 11 until he died three days later. So far as shown by the record, only his wife (the defendant) and two neighbors, Mrs. Marvin Watkins and Mrs. L. E. Holloway, saw the deceased during this period. Mrs. Watkins and Mrs. Holloway testified substantially as follows:
Mrs. Watkins: I was present at Mrs. Hill's home during the last illness of her husband, Leroy Hill. She came for me. I believe it was on Monday before he died on Thursday. The first day when I went he was cramping in his stomach and his legs would be kind of paralyzed and he couldn't stand to touch his legs and his arms, and vomiting. That first day he didn't vomit so much as that night and then just continually. Not anyone was present at the time I first went to his home except him and Bertha. I believe I stayed about two hours that first day, then she came for me the next day. While I was there the first day, Mrs. Bertha Hill did not try to get a doctor for him. I said something about a doctor, and she said she had him in the hospital several times. She said the doctor said they couldn't do him any good. He was just as well off home. I suggested giving him a dose of oil. She gave him some coffee, I believe, one time and then she gave him some soda water and salt water, he had asked to make him vomit. He said stuff was gathering around his heart and he had to have something to make him vomit. I was just there when he died. He died in the morning about two o'clock. Just prior to his death he'd have weak sinking spells. I believe he vomited all the time. The vomit was green all the time except one time, the last time, it seemed yellow or reddish looking. Bertha called by attention to it and said she thought it was blood. I think I saw Mrs. Hill give him one capsule one time. I wouldn't say for sure, but it seemed she got that capsule from a chest of drawers or maybe on the table. I fixed some castor oil for him and gave it to him myself. My daughter, Mrs. Holloway, was also present in the house when he died.
Mrs. Holloway: I was present at the time Leroy Hill died. I went there because Bertha came after my mother and said she thought Leroy was dying. The first time I went there was on *Page 698 
Monday morning. When I got there he was just vomiting. The vomit was a greenish color. He was complaining of pain, just rolling in the bed and said if he could get easy for one minute. He did not say anything about going to the hospital or wanting a doctor. Bertha told us the doctors told her that he'd be just as well off at home as he would be in the hospital, that they had done all they could for him. We spent the night up there, my mother and I (Tuesday night). He was just the same that night, wasn't any better. He vomited most of the time. Mrs. Hill was present at that time. She did not make any effort while I was there on that occasion to get a doctor for him. She gave him one capsule, but I think he vomited that up, and then I think it was on Wednesday night she gave him a dose of medicine. I don't know what it was; it was a liquid medicine. He asked her what it was and she said she had forgotten, didn't know whether it was for the heart or something else, "I forgot," and he said it burned him so bad not to give him any more. He was complaining with stuff gathering around his heart most of the time, he'd have to have salt water and soda water and stuff like that so that he would keep on vomiting. He said that when he got sick the next day he wanted to go to Dr. McCall, I believe it was, and said he wanted him to operate on him and see what was the matter with him, but he died that night, he didn't live until the next morning. After he died I had some conversation with Mrs. Hill. We had to wait for the ambulance to get there for him. Bertha and I dressed Leroy before the undertaker got there. After we dressed him she went and got her insurance policies and brought them back in the room and was showing them to me and said it was a good thing she had the insurance, that she had spent about all the money they had for doctors' bills.
Dr. Warren B. Matthews testified that he removed certain organs from the body of Leroy Hill and took them to Dr. George T. Lewis, a toxicologist, for chemical examination; and Dr. Lewis testified as to the result of his examination, portions of the testimony of each of these witnesses being as follows:
Dr. Matthews, after qualifying as an expert, testified: I performed an autopsy on the body of Leroy Hill in Rome, Georgia, *Page 699 
on February 15, 1946. I removed the stomach and part of the intestines and part of the liver and part of the kidneys. I found the intestines and stomach irritated and inflamed and I found what we call "toxic changes" in the kidneys and the liver. The conditions that I found there could not have been caused by an embalming fluid having been injected into the body because these conditions that I described were conditions that had to be caused before death. I say that because of my experience in such examinations. I did not myself make any chemical tests of the contents of the stomach. The condition that I found there could have been caused by a poison of arsenical compound. My examination indicated that he died of the conditions that I described, but I could not state what was back of those conditions without further analysis. The stomach was reddened in spots and inflamed and green with bile in other spots. The mucus membrane appeared to be bile stained and to be inflamed. There was swelling of the liver and kidneys. In the form of arsenic trioxide, which is the one to which I shall refer, the lethal accepted dose is three grains, or thereabouts.
After I had done my autopsy on this body I took the organs to Dr. George Lewis of Emory University and delivered them to him for a toxicological examination. His specialty is that of chemistry, or particularly what we call biochemistry. I think the toxic changes that I saw from the organs I removed were the cause of Leroy Hill's death. This stomach was practically empty; there was only a tablespoonful or maybe two tablespoonsful of material.
I gave it to Dr. Lewis just as it was. From my analysis, I couldn't tell what caused the toxic changes I described in the liver and kidneys. By "toxic changes" I mean changes that we see. The organ looked swollen, discolored to some extent, it looks entirely different from the normal organ; sometimes we describe it as having a cooked appearance. There are many things that could have caused that. From what I had, I did not know what caused that. An arsenic compound is a standard remedy for a syphilitic condition. Neoarsphenamine and arsphenamine differ, in that neoarsphenamine is a little less toxic than arsphenamine — it causes a little less reaction and it contains *Page 700 
a different form of arsenic. If a person was taking a shot of either neoarsphenamine or arsphenamine and became confused, took the wrong one, and took arsphenamine in the normal dose that he could have taken neoarsphenamine, I don't think it would kill him, but he would be awfully sick. If he took an additional shot pretty quick, there would be a limit. From what I saw, assuming that it was arsenic poisoning, I would say that it was ingested, definitely. I say that because I have never seen so much irritation of the stomach and intestines from arsenic taken any other way. It was not possible that injection into the body of embalming fluid containing arsenic would have produced the things that I found in the organs of the body that I removed from Leroy Hill. I say this because the changes that I described, I know from experience, were there before death. A person who is suffering from acute arsenic poison usually lives for a few hours to perhaps a week.
Dr. Lewis testified: Dr. Warren Matthews turned something over to me for examination during last year. This consisted of a series of specimens in a container of the body of Leroy Hill. I made some examinations and chemical analyses of those things. The specimens were analyzed primarily for arsenic and secondly for lead. Large quantities of arsenic were found. No lead was found. We found twenty-five milligrams per hundred grams of stomach wall, approximately five milligrams per hundred grams of intestine, one and one-half milligrams per hundred grams of liver, and one milligram per hundred grams of kidney. I found no lead in the contents that were delivered to me. That would certainly indicate that whatever was taken into the body was not lead arsenate. If it had been lead arsenate, I would expect there would have been some signs of lead in the material I examined. The greatest concentration of this arsenate was found in the wall of the stomach. I would certainly think that arsenic was introduced by the mouth, which is the same as by ingestion. I say this because the distribution is such as one would anticipate following that route of administration. From the amounts found that I have just previously described, I would say a lethal dose of poison was present in that body. I found traces of that poison in the intestines and the liver and the kidneys *Page 701 
also. I would think the amount I found in the liver and kidneys would be sufficient to cause death. In my opinion, from what I found from my examination, arsenic poisoning caused the death of Leroy Hill. The most common symptom in the intestinal tract in cases of arsenic poisoning consists of vomiting, diarrhea, a sort throat. There are pains in the limbs of the body, pains in the abdomen also. If a person had been poisoned by arsenic and would vomit, this substance would be very thin watery material which may be bile tinged, that is, yellow. If the arsenic I found had been introduced through the body either intravenously by injection for syphilis or by injection for the purpose of embalming the body, I wouldn't think that I would have found the amounts and distribution of it in the quantities I found in the material turned over to me by Dr. Matthews. I examined enough of the contents of what was delivered to me by Dr. Matthews to determine whether or not a lethal amount of arsenic had been administered or taken by Mr. Hill. I would characterize this analysis and the amount I found as way over the lethal amount. It is a matter of opinion as to how long a person would live normally if he had taken or was given a dose of arsenic sufficient to cause the condition that I found. The length of time varies. My opinion is that it would be certainly less than twenty-four hours.
It appeared that the deceased, Leroy Hill, had been treated in Harbin's Hospital from January 13 to January 17, and in Floyd Hospital on two occasions, from January 22 until January 31, and from February 4 to February 8, 1946.
Dr. E. Bosworth testified that he was a practicing physician in Rome, and on January 13, 1946, had occasion to examine Leroy Hill at Harbin's Hospital. He made the usual physical examination, and the patient was complaining about upset stomach and sore throat, and said he had taken some shrimp that disagreed with him, that he had a fever of 103 and had acute tonsillitis with some ulcerations on his throat; also that he had a primary lesion of syphilis, syphilis in the first stage, and this fact was confirmed by a Kahn test. He gave the patient penicillin for that, but did not finish the complete course of penicillin, as he stayed in the hospital five days and was discharged on the 17th, and though he *Page 702 
was supposed to, he never came back. Penicillin is the usual treatment given, supplemented at a later date with some kind of injection of bismuth. Another treatment is weekly injections of arsenical drugs supplemented with bismuth; the witness commonly used neoarsphenamine injected in the veins in set doses at approximately weekly intervals. If it were injected into the tissues, it would be irritating, but it would not become necessarily dangerous to the patient's life, but would make an extremely sore place at the injection. The witness did not know what treatment Leroy Hill took after he ceased to take the witness's treatment.
Miss Mary Rogers testified: She worked as Record Librarian at Floyd Hospital and was familiar with the records of the hospital. During 1946 Leroy Hill was a patient at that hospital, first from January 22 to 31, and later from February 4 to 8. While there Dr. Mull treated him first and transferred him to Dr. Garrard, and Dr. Garrard treated him the second time. The hospital records did not show Leroy Hill as being there on February 11, 12, 13, and 14. The first time he was there he had penicillin, glucose, and neoprontosil and neoarsphenamine, and urotropin, morphine, milk of magnesia, cascara, citro carbonate, amphojel. On February 8 he was given five doses from a prescription that just said R. Z. C. All prescriptions and medicine were administered under the instructions of Dr. Garrard. He was discharged on February 8 as "improved." On his first admission the diagnosis was tonsillitis. The record did not show whether he was given any drugs or hypodermic for treatment of himself after he was discharged.
Dr. J. L. Garrard testified: Leroy Hill was under his treatment during the interval indicated by the record of Floyd Hospital. Up to or about January 22 Dr. Mull treated him, and then the witness saw him until the 31st, when he was discharged. He returned about February 4 and was discharged February 8. At the first, he was being treated for acute syphilis and improved apparently, as no treatment was given him for the syphilitic condition when he returned the second time, in February. "I think the chart indicates something about his stomach record the last time. That was the 4th, and the chief complaint as I have it down here on this chart was nausea and vomiting, started *Page 703 
vomiting and continued to do so throughout the night, could not take medication and retain it." "The condition of vomiting and nausea that I have described could be produced by the taking of arsenic orally, in a large dose." The witness did not give him anything containing arsenic that he knew of, unless it was in the prescription, and he did not think it had any arsenic in it.
Dr. J. H. Mull testified: "I did not treat Mr. Hill when he first came into the hospital. I probably saw him and let them admit him but I had previously told him that I didn't treat venereal diseases, for them to get Dr. Garrard to treat him. . . According to this page for 1-26-46, a dose of neoarsphenamine seems to have been given by me. That is an arsenical compound. . . There is not enough arsenic in there to have caused death."
Paul Jordan testified: He was a merchant and funeral director living in Centre, Alabama. On December 15, 1945, he wrote a burial-insurance policy on Mr. and Mrs. Leroy Hill, dated December 15, 1945, on which Mrs. Hill paid the premium of $1.10, "and which would have lapsed on February 15th. She paid only one month," and the policy lacked just "two days of being expired." After the death of Leroy Hill, the witness came and took his body to Centre, Alabama, embalmed it, and returned it to Rome, Georgia. The witness had issued burial policies on Mr. and Mrs. James R. Hardin, parents of the defendant, and had buried them after their deaths the previous year. He also testified: "I later went back to the place where I had buried the bodies of Mr. and Mrs. James R. Hardin with Mr. Rehling, the sheriff, Mr. Russell, and four employees. After we got to this cemetery, we prepared to take the bodies up, and did take them up. Both bodies were taken up from the grave and contents taken from the bodies. Dr. Rehling performed an autopsy upon those bodies at that time." "Dr. Rehling removed some of the organs from the bodies of Mr. and Mrs. James R. Hardin and carried them with him. Those bodies were reinterred and buried."
The evidence showed that Mr. Hardin died April 3, 1945, and that Mrs. Hardin died July 13, 1945; also that they were living in the home of defendant and her husband at the times of their deaths. *Page 704 
Ruben McClung testified: I lived at Coosa in February, 1946. I was not present when Leroy Hill died. I went to the house where he had lived formerly, after his death. I went because Bertha came after us. She just said Leroy was dead, and wanted us to come up there. I stayed there about fifteen days. My wife and children were with me. While I was there I had occasion to look around the house. I have seen this bag you show me, State's Exhibit No. 2, before. I first saw it in Bertha Hill's back room out on the Summerville road at the same place I went with Bertha Hill and spent the night on February 14. I don't remember what date of the month I first found this; I guess it was about a week after Mr. Hill's death. I found it under some quilts in that back room. After I found it I put it back where I found it. I told Mr. Frank Russell, the deputy sheriff of Floyd County, of having found it, and he asked me to let him see it. I never did mention to Mrs. Hill, after I found the bag, that I had found it. I don't know who had put this bag there. Me and my wife was at the jail one day, and Mrs. Hill broke down and went to crying, and my wife asked her what the matter was. She said they were going to take up her father and mother. She didn't want them to, but they would find them poisoned. My wife asked her how did she know. She said she had seen Leroy give them the poison. That statement was freely and voluntarily made by Mrs. Hill. I wasn't in there prowling around. I happened to get under the quilts because I was looking for what she told me to look for. She told me to look for canned fruit and bring her some over to the jail.
Frank Russell testified: I am a deputy sheriff of this county. I know Ruben McClung. This bag which you show me, previously identified as State's Exhibit No. 2, was given to me by him on February 25, 1946, at Bertha's home. I have kept it since I brought it into court. I saw you yesterday in this courtroom tear the bag slightly and pour out some of the contents of that bag for the examination of Dr. Rehling. There was something in that bag at the time it was turned over to me. I looked at the contents of the bag, and they were pinkish looking. It appears to be the same pinkish looking now.
Mrs. Ruben McClung testified: I am a sister of Mrs. Hardin *Page 705 
who died in 1945. I remember Leroy Hill's death was sometime in February, 1946. On the date of his death Mrs. Bertha Hill came down to my house at Coosa in Floyd County, and told us her husband was dead and she wanted us to go up to her house with her. My husband and my children and I went with her to her home. We stayed there at the home about fourteen or fifteen days. During the time we were there she was arrested and put in jail. My husband and I called on her at the jail. One day when we went up there she told me they were going to take up her father and mother; that her lawyer and them were going to have it done. She was crying when I went up there and I asked what was the matter. She said they were going to take up her father and mother and she said they would find poison, but she didn't do that — Leroy poisoned them. She saw him when he poisoned them both. Just me and my husband were present at the time of that conversation. The best I remember, that conversation occurred two or three weeks after Leroy's death, it might have been three weeks. She volunteered the information about which I have testified. She was crying and very much upset at that time.
Miss Louise Poole testified: I lived in Pleasant Valley, which is about six or seven miles out the Summerville highway, during the years 1944 and 1945. I know the defendant, Bertha Hill. During the time I lived at Pleasant Valley I was her next-door neighbor. When I first knew anything about them Mrs. Hill's husband, Mr. Gossett, was living there, and her mother and daddy, Mr. and Mrs. Hardin. Mrs. Hardin is dead now. She died in Floyd County on July 13, 1945. I first saw her that day before her death on the evening of the 12th. My mother had been down there that day and when I got in from work she told me that Mrs. Hardin was seriously sick and talking of dying and said for me to go down there. There wasn't anybody there except the home people, so I went down to Mrs. Hardin's home and she was laying there sick and talking of dying. Mrs. Leroy Hill was present. Doctor Williams came out and he wrote up some prescriptions, and Bertha and Leroy went to get the prescriptions. When they came back I was still there and Bertha came in through the hall that led into her and Leroy's bedroom, and then *Page 706 
Mrs. Hardin was in the room next to that, and instead of bringing the medicine into the room where we were Bertha left the medicine in her and Leroy's bedroom and I didn't get to see what the medicine looked like. She asked if she should give her mother a dose then. Then she got a capsule. I didn't see what she got it out of except she did go to this place where she had put the medicine in a chest of drawers, and whether she got what the doctor prescribed I don't know. I do know it was a capsule. She gave it to her mother and she had something in a glass, it looked like orange juice, but what it was I do not know. And Mrs. Hardin would tell her if she took that it would kill her, and Bertha insisted upon Mrs. Hardin taking the juice, but she did not take it because she said, "If I take another drink of that, it will kill me." After I got there I found she was seriously sick. She was vomiting, I would say, almost half of the time, just every few minutes and it was kind of a greenish-yellow like color; didn't have green color, didn't have a yellow, kind of mixture-like color, and she would say it was poison. She would say, if she took it would kill her and that Bertha was killing her. Nobody else gave her anything while I was there except Bertha would give her those capsules. I couldn't say the exact number I saw her give her, but if I am not mistaken they were to come every hour. I just couldn't say how many times I saw her offer anything that looked like orange juice, because it was every few minutes.
Mrs. C. E. Poole testified: I am the mother of Miss Louise Poole, who just left the stand. I knew Mrs. Bertha Hill's mother. Mrs. Hardin is dead now. I was present when she died on the 13th day of July, 1945. I spent the afternoon with her on Tuesday before she died Friday morning. She was not sick on this Tuesday that I spoke of. The next time I saw her after this Tuesday was Wednesday night; she just seemed to be right sick and vomiting. I didn't stay very long, for Bertha asked me if my husband would carry her to the hospital, and I said he would, and I went on home and changed clothes as quick as I could and me and my husband and Bertha and Mrs. Hardin came over there to McCall's Hospital. When she was vomiting I didn't notice the color or texture of that vomit. Those spells of vomiting *Page 707 
were just most every hour. Bertha would give her a capsule about every hour and she would vomit them up. Mrs. Hill went to the hospital with us. We four were in the car. That was on Wednesday night, the 11th of July. After we got to the hospital, Bertha went in and the head nurse came out to the car and asked Mrs. Hardin if she wanted to stay and she says, "No, I don't." And she says, "Well, I thought if you did why we have not any room." And Mrs. Hardin said, "Well, I don't want to stay." Then Bertha came out to the car. My husband told her that she said Dr. Mull said he couldn't see them, that they had a patient come in with a broken bone and he says, "Well, we will wait awhile." Mrs. Hill says, "No, we will go on back. I will get something to ease her." I don't know of anything else she said except she wanted to stop at the drug store. We stopped at the drug store and Bertha got out and went in. I do not know what she got there. I later saw Dr. N. L. Williams out there at this house; that was after Mrs. Bertha Hill had gone in the drug store that I spoke of. I don't remember just what time it was that my husband and Mrs. Hardin and Bertha and I got back out to their house, but just as quick as Bertha got through at the drug store we went right straight on back. When we got back to Bertha Hill's home with Mrs. Hardin, we didn't do any more than just stop for them to get out of the car. Mrs. Hardin went back in the house. While they were in Rome no effort was made to see any other doctor besides Dr. Mull. After Mrs. Hardin was taken out of the car, my husband and I went home. I am not going to say that I saw Mrs. Hardin again until about sundown that Thursday afternoon. Her condition seemed to be about like it was the night before. She was still vomiting. She did not have any other symptoms that I particularly know of to indicate she was still sick. She was just vomiting. After she got back from the drug store that night, she gave her one capsule an hour up until 11 o'clock. They never did take Mrs. Hardin out of the car at the hospital. I don't know why they didn't.
Mrs. C. C. Lynch testified: I live out on the old Summerville road. I was living there during 1945 and 1946. I knew Mrs. James R. Hardin and Mrs. Bertha Hill. The Pooles lived on one side of them and I lived on the other. Mrs. Hardin is now dead. *Page 708 
I was present at the time of her death. Mrs. Poole and Bertha came after me, and when we got back over there, there wasn't anybody there except one lady and so — but in the meantime — after that there was Leroy, Bertha's husband, and another man had gone after Mrs. Hardin's father, I understand. Bertha just kept on insisting that she was afraid she was hungry you know, and she wanted, kept wanting to give her some more juice — Bertha called it orange juice. Mrs. Hardin was unconscious. She couldn't swallow. I was not present when Dr. N. L. Williams came out there. I don't know whether or not Bertha Hill gave her any of the medicines Dr. Williams had prescribed. I didn't see any medicine. When I first got there, Mrs. Hardin was unconscious; was struggling, just rattling in her throat, you know, like people do when they are dying, I imagine. I don't know where the orange juice I referred to was prepared. Bertha went in the kitchen and got it some place. I don't know where she got it. As to whether I had seen Mrs. Hardin on the 11th or 12th of July prior to her death, that is the first time I went over there. While I was there the defendant made an effort to get a doctor. Bertha and I went back to my home. They used my telephone so they went back to my home and I called and tried to get three different doctors for her mother and I didn't ever get to talk to but one. I talked to Dr. Mull and he said he couldn't come. And so I told Bertha what he said, and she said she didn't want to carry her to the hospital. We went back and her mother died just a little bit after we went back there. They didn't try to get Dr. Williams to come back at my home. My husband was at home in bed when they were making those calls. I heard him make some suggestion to Mrs. Hill. He says, "Why don't you carry her to the hospital?" and she said, "I don't want to carry her to the hospital."
Dr. N. L. Williams testified: I knew Mrs. Zola Hardin before her death. She was a patient of mine approximately two years ago, I believe, in the month of July. I was called to see her at her home one afternoon by the family, and when I arrived there I examined the patient and found that she was suffering what appeared to be acute stomach upset, commonly called food poisoning. Her main symptom was vomiting. I did not see her *Page 709 
vomit, but she was nauseated at that time. I believe some relatives and Mrs. Bertha Hill were there at the time I was examining her. The patient was pale, had somewhat of a rapid pulse; other than that I did not find any evidence of any other disease. I felt of her skin; it was somewhat pale, clammy, as frequently is when people have acute illnesses. It is possible that I would expect to find the symptoms that I found there on Mrs. Hardin if a person had previously ingested a large amount of arsenic or arsenic compound. It could be the normal symptoms under such a set of facts. I later went back to visit Mrs. Hardin. I was asked by the family to return the next day to recheck her condition. When I arrived the next afternoon, I was told that she had passed early that day. I gave as the cause of Mrs. Hardin's death, "not determined." I prescribed a medicine for Mrs. Hardin commonly used for acute stomach upset. It contains an amount of paregoric and what is called kaolin. It did not contain any arsenic or arsenic compound. That would be the wrong thing to prescribe for an upset stomach.
On being recalled, the witness testified: I testified on yesterday I prescribed for Mrs. Hardin the first time I saw her. It was something to alleviate a stomach condition she had. I believe that prescription was a liquid. As far as I remember, I did not prescribe capsules. I couldn't be positive whether I did or didn't. I am just saying that from my best recollection.
H. H. Fleming testified: I knew Mrs. Hill's father, James R. Hardin. He rode with me right smart at night to Lindale and back, but he hadn't rode with me since January. January the 23rd was the last night he rode with me until Bertha came after me the morning he died. I was present when they put him in the ambulance. I had been there for about thirty minutes when they put him in the ambulance. He looked like a dying man to me at that time. He was home in bed at the time I saw him. His wife and Bertha were there. When I went up there he was lying on the bed, and he just could talk and he commenced talking to me and Mrs. Hardin stooped over where we could hear what he said, and he said he worked last night and came home and he was on a diet and his wife didn't have nothing fixed for him to eat, and said, while he was talking to his wife Bertha came *Page 710 
in and said she had got him some new medicine, and he said, "I took it," and said, "If you don't get me to the hospital or get a doctor I am going to smother in the next few minutes." And he just turned over. He didn't make any statement as to whether he wanted to take that medicine or not. I helped put him in the ambulance, but I did not go to the hospital with him. The next time I saw him he was at home there, a corpse. That was the next day.
Dr. Robert Norton testified: I am a medical doctor. I knew James R. Hardin during his lifetime. I saw him in December, 1944. In looking up the hospital record I find I did see him the time he was brought in, and he expired shortly after he was brought into the hospital. I don't know the date of his death, but I saw him December 4, 1944; he was in the hospital at that time. I treated him for several days. I saw him on the night he died; however, I recall very little about it. He was brought in a dying condition and died within less than an hour, I believe, after he was brought in the first-aid room. He was never admitted to the hospital, I believe. On that occasion he had stomach hemorrhage, but it was an internal condition, we couldn't question him at that time. I had seen him professionally previous to that day, the time I saw him in December, 1944. I hadn't seen him immediately prior to the day he died. I don't recall what time of day or night that was. It was in the McCall Hospital first-aid room. My recollection is very vague on any physical characteristics I observed there at the time or shortly before he died. The last time I had seen him prior to that was the December visit to the hospital in December, 1944. The night he died he had been vomiting blood. It was my opinion that that condition was a result of a stomach ulcer which I knew he had. On two previous occasions he had a profound stomach hemorrhage, one in 1943, I believe, and he had been bleeding again in 1944 when I saw him in the hospital. If an ulcer was the result of a lesion of syphilis, which is a fairly rare condition, then arsenic compounds intravenously are prescribed treatment for that. James R. Hardin did not have syphilis to my knowledge. At that time it was my opinion that he had a fatal hemorrhage from his ulcer. I have had no opportunity to form any *Page 711 
opinion based on what I saw since that time. If a lethal dose of arsenic had been ingested into the body shortly before Mr. Hardin's death, I think that alone would have been enough to have caused his death.
Dr. C. J. Rehling testified: I am employed by the State of Alabama as State Toxicologist, which is director of the State criminal laboratory. We handle the scientific aspects of criminal investigations. In my capacity as State Toxicologist I made an autopsy of the bodies of Mr. and Mrs. James R. Hardin. I performed exhumations and autopsies on the bodies of Mr. and Mrs. James R. Hardin on March 27, 1946, at a cemetery near Centre, Alabama. I removed the organs from each of the bodies and brought them with me to Auburn to my laboratory and made examinations and analyses there for poisons. Examination internally of the body of James R. Hardin disclosed a remarkable state of preservation of organs. The stomach particularly was very well preserved and the examination of its contents revealed white powder therein and a graying corrosion of the walls. The white powder was identified and the other organs were examined for various poisons and arsenic was identified in these several organs. White powder in the stomach was identified as lead arsenate. The analysis of the upper end of the small intestine, of the liver, of the spleen and of the kidneys identified arsenic in each of those. The distribution of arsenic in these various organs was consistent with its distribution as occurs during life, as distinguished from post mortem. The stomach wall was distinctively colored and altered in a manner that arsenic itself does produce.
The body of Mrs. Hardin was in much the same condition. In my opinion, this arsenic entered the bodies of Mr. and Mrs. Hardin during life. The amount of arsenic absorbed and distributed in that body is sufficient to have caused death in either case. In my opinion death was caused in the case of Mr. Hardin and Mrs. Hardin by arsenic that I found.
Dick Hand testified: I am employed as office manager by the Pepperell Manufacturing Company at Lindale, Georgia. James R. Hardin was employed by that company. Our company carries a group insurance policy upon our employees with Metropolitan. *Page 712 
That policy covered James R. Hardin for one thousand dollars. The beneficiary of that policy was Bertha H. Gossett. James R. Hardin does not still work for our company; according to our records he is dead. A payment was made upon the insurance with the Metropolitan Life Insurance Company that covered his life. The record here shows that we mailed the check to Bertha Gossett, Box 625, Rome, Georgia, on April 20, 1945. We have a copy of the master policy that covers the whole company. We do not have the individual policies. Whenever there is a death that occurs, the certificate issued in pursuance of the master policy is sent to the Metropolitan in New York, and that was done in the case of James R. Hardin. The check that was mailed on April 20, 1945, was for one thousand dollars, and was mailed to Mrs. Bertha H. Gossett. We wouldn't know whether or not it was ever returned. It wasn't returned to us. In other words, it was Metropolitan's check.
P. H. Lewis testified: I am employed by the Gulf Life Insurance Company. I had occasion to talk with Mrs. Leroy Hill about insurance upon her mother and her husband and herself. About the first week of July, 1945, she called our office and asked the office girl to send someone out to see her. I went out to see her. She first wanted to know how much insurance she could get on her mother. This paper which is identified as State's Exhibit No. 10 is an application that I completed on Mrs. Zola M. Hardin, who is the lady that I was told to be the mother of Mrs. Hill. Mrs. Hill wrote Mrs. Hardin's name in there, and Mrs. Hardin signed by mark. Mrs. Hardin said she couldn't write. I made an appointment with her to bring Mrs. Hardin in and have her examined, and in about that length of time she did bring Mrs. Hardin in and have her examined by Dr. McCord. Dr. McCord failed to send that specimen to the home office. I later saw Mrs. Bertha Hill after that was signed. She came around and paid twenty-nine dollars and some cents on the application. Mrs. Hill subsequently came to our office after her mother's death. When she saw me was when she came in and asked me if we were going to pay the claim. I told her, no, the policy hadn't been issued. The only thing we could do was refund her payment that she had made with the application. *Page 713 
When I went out to the house there, I took two applications when I was talking with her the first time, I think. The other application was on herself. That policy was never issued and Mrs. Hill never paid any premium on that policy.
The testimony of the above witness was corroborated by that of M. L. Alford, also an employee of the Gulf Life Insurance Company.
Mrs. P. H. Jenkins testified: I am employed by State Mutual Insurance Company. I delivered that policy (referring to policy for $2500) to Mrs. Hill. A premium of $11.80 was paid on that policy for three months. She later came in one morning about nine or better, when we came to work, I believe it was around the 14th of February, 1946. She said her husband had died and she had the insurance policy, and said she wanted the money, for her husband had died that morning. She was the beneficiary in that policy. She was not paid the money then and there on that demand she made. Mr. Garner attends to the filing of death claims, and I took her to Mr. Garner and she talked with him about that. The morning Mrs. Hill came in to tell me about her husband's death, I asked her what he died of, and she said, "He died of poison from an infected throat." I asked, "Where did he die?" and she said "Floyd County Hospital." She said he died that morning.
It appeared that the policy just referred to as having been issued by State Mutual Insurance Company was settled for $300 on April 20, 1946. M. G. Hicks testified: I am an attorney of this city. This is my signature as a witness to the signature of Mrs. Bertha Hill, dated the 20th day of April, 1946, on a policy of insurance, Policy No. 15132, identified in the record as State's Exhibit No. 6. Mrs. Hill signed that in my presence. I believe Carl Griffin was present. That (indicating) is her signature. We received the money as attorneys' fees is the reason we settled the case.
The evidence showed that the policy issued by Liberty National Insurance Company contained an "emergency draft" for $100, which was cashed by the defendant the day of the death of the deceased. The local manager of this company testified: "I do not know whether Mrs. Bertha Hill has ever made any effort *Page 714 
to collect the face value of the policy itself. No proofs of death were ever submitted through our office here or through me. It would be the normal course of procedure for the death claim to be submitted to me or to my office in a death case under one of our policies which had been issued through our office."
It appeared from documentary evidence introduced by the State that the above policy was canceled by a judgment of the Superior Court of Floyd County in July, 1946, on petition of the insurer.
A. A. Barrett testified: I was just casually acquainted with Leroy Hill in his lifetime. As to being acquainted with Mrs. Bertha Hill, I met them right at the courthouse door. I couldn't tell you nothing about what time that was, it was about the time we had Chuck's Camp locked up out there. Mr. and Mrs. Hill were standing there leaning just inside the wall, and Mr. Hill said to me, "I understand you got a house to sell." And I told him, well, I had had a house to sell but I had backed out, and they came up and we started a conversation there, and they said, if there is a market for a home they would have a $3000 policy to collect shortly and they'd have $3000 to put in the home. They did not say on whose life that policy was. At that time Mrs. Hardin had been dead probably a week or ten days or maybe longer. Both Mr. and Mrs. Hill were carrying on the conversation, and when they made the offer said they'd have that much to put on a home I said, "I wouldn't be interested," and then it broke off.
In this connection, see testimony of P. H. Lewis, supra.
The defendant made a lengthy statement. Among other things, she referred to the sickness of her mother and her father and to what she had undertaken to do for them. She stated that her mother did not want to go to the hospital, and that her husband, Leroy Hill, thought it was unnecessary. She stated, in effect: that her efforts to procure insurance on her mother's life were at the latter's suggestion; also that the insurance which she procured on the life of her husband had been previously discussed by them just as a husband and wife would discuss such matters; that her husband had a venereal disease, and that his physician told her of it, stating that he had discussed it with the husband, and *Page 715 
that they had decided to tell her; that before her husband was taken to the hospital, he had been taking some medicine, giving himself shots with a hypodermic needle; also that a man named Sam Mercer had furnished her husband whisky from time to time, and that every time he would drink it, it would make him deathly sick. She did not know what became of Mercer. (Her attorney also testified that he had made diligent effort to locate Mercer and could not do so.) "And as far as loving my mother and daddy, I always worshiped my mother and daddy. I lived with them from the time of birth up until quite a few years after I married. I married the first time in Alabama, and if I hadn't cared something about them and been interested in their welfare, I'd left them down in Alabama where they were. I brought them up here where I could take care of them. I did take care of them up until their deaths. I did everything I could. I also did everything I could for Leroy because I didn't hold it against him for having this awful disease or anything about it. I worshiped him. I loved him, I guess, better than anything, even better than I did my mother and daddy, but I done everything I could in the hospital, bills and calls, kind of things like that. On this emergency draft, it was my understanding through the company that in case of emergency that you were supposed to use this draft. As you know, taxi bills, ambulance bills, hospital bills, and doctor bills take money, and I did go and get the emergency slip because I had to have money, some things to do that I did have to have money, and I went and asked about it and they were nice about it. They didn't return a word. They gave me the money when I asked for it because the insurance called for it and they did give it to me."
The supplementary statement of the defendant was: "There was one other thing I wanted to say about these capsules. I think they said I gave them. Those capsules were from a doctor's prescription. I do not know what they contained. I wouldn't get up on the stand and swear what they contained because I didn't examine them, and I do know that I am not guilty of anything I am being accused. I do not know what the capsules contained, but I do know they were from a doctor's prescription. That is all." *Page 716 
The grounds of the original and amended motion for a new trial are sufficiently indicated in the decision.