18577. WHITE *v.* THE STATE.

CANDLER, Justice. Lillie Mae White was indicted for the murder of Janie May Marshall (a three-year old child). It is alleged in the indictment that the accused committed the act for which she was charged by striking the deceased with her hands and fists and by striking and beating her with some blunt instrument to the grand jurors unknown. The jury convicted her with a recommendation that she be imprisoned for life. Thereafter she filed a motion for new trial on the usual general grounds and later amended it by adding a special ground, in which she complained of a remark which counsel for the State made in his argument to the jury. She excepted to a judgment denying her motion for new trial as amended. *Held:*

1. There is no merit in the general grounds of the motion for new trial. The evidence, though circumstantial, was amply sufficient to support the verdict. For cases where a conviction was obtained on circumstantial evidence and where the verdict was upheld by this court, see *Giles* v. *State,* 6 *Ga.* 276; *Mitchum* v. *State,* 11 *Ga.* 615; *Houser* v. *State,* 58 *Ga.* 78; *Johnson* v. *State,* 73 *Ga.* 107; and *Wrisper* v. *State,* 193 *Ga.* 157 (17 S. E. 2d 714). These cases hold that it does not require any greater degree of mental conviction to base a verdict on circumstantial evidence than it does on positive or direct testimony; and that the evidence, whether it be direct or circumstantial, is sufficient to authorize a verdict of guilty when it satisfies the mind and conscience of the jury of the defendant's guilt to a moral and reasonable certainty and beyond a reasonable doubt.

2. During his arguments to the jury, Frank French, of counsel for the State, remarked: "This case is not a case of involuntary manslaughter; this is a case of murder. When this defendant, this woman, was beating this child, she had her heart full of malice. She had to have malice to beat the child as she did." Because of this remark, and at the time it was made, the defendant moved for a mistrial on the ground that it was not referable to nor authorized by any evidence introduced on the trial of the defendant's case. There is no merit in this contention, as the complained-of remark was a reasonable, logical, and legitimate inference which counsel for the State was authorized to draw from the evidence introduced on the trial. "In a prosecution for a homicide, a statement by the prosecuting attorney in his argument, expressive of his opinion of the defendant's guilt, . . . should be construed to mean that the testimony led him to this conclusion, and that the jury

should reach the same conclusion. In the absence in anything to the contrary, the solicitor's remarks will be regarded as a deduction from the evidence. . . What the law condemns is the injection into the argument of extrinsic and prejudicial matters which have no basis in the evidence." *Floyd* v. *State*, 143 *Ga.* 286, 289 (84 S. E. 971). Under this rule as applied to the facts, the court did not err in refusing to grant a mistrial; and this is especially true in view of the fact that the judge, in the presence of the jury, severely rebuked counsel for having made the remark and instructed the jury to completely disregard it in its consideration of the case. In this connection, see *Smalls* v. *State*, 105 *Ga.* 669 (3) (31 S. E. 571); *Milam* v. *State*, 108 *Ga.* 29 (1) (33 S. E. 818); *Gossett* v. *State*, 203 *Ga.* 692 (8), 695 (48 S. E. 2d 71).

3. For the reasons stated in the two preceding headnotes, the court did not err in denying the motion for new trial as amended.

*Judgment affirmed. All the Justices concur, except Wyatt, P. J., and Head, J., who dissent.*

SUBMITTED MAY 11, 1954—DECIDED MAY 31, 1954.

*Swift Tyler, John Tyler,* for plaintiff in error.

*Charlie O. Murphy, Paul Webb, Solicitor-General, Eugene Cook, Attorney-General, Rubye G. Jackson, Frank S. French,* contra.

On the trial, the State's evidence and the defendant's statement, so far as material here, were in substance as follows:

Dr. A. J. Crumbley, Fulton County's Medical Examiner, testified: On an examination of the body of Janie May Marshall, as made by him on September 27, 1953, he found multiple bruises, abrasions, and cuts on her head, face, arms, shoulders, and on the lower parts of her body. An autopsy revealed a swollen condition of her brain, and there was a blood clot beneath the covering of the brain and pressing on the brain. On the left shoulder there was a large bruise with swelling, approximately six inches across. There were large bruises on the breastbone and the left flank and hip. The right hand was bruised and swollen considerably, and there was a laceration between the fourth and fifth fingers which extended back into the body of the hand. This laceration was rear-type, meaning the injury had been inflicted by pulling the fingers apart. There were multiple scratches and scratch-like wounds on the child's back with bruises beneath these wounds. The bruises in the muscles and the fat beneath the skin indicated rather severe blows. The internal organs of the child's abdomen were not

diseased or ruptured. He estimated the age of the child to be about three years and her weight to be twenty-five to thirty pounds. In his opinion, the death of the child resulted from multiple blows inflicted by a blunt instrument; that death resulted from all of these injuries, but the principal cause of her death was an internal hemorrhage on the brain, which alone could have caused her death; that the wounds found on the child's body could not have been caused by her falling down four or five steps, but they looked like wounds which had been inflicted on the child's body by the use of a blunt instrument; and that the bruises, abrasions, and wounds which he saw on the body of the child could not have been caused by a whipping administered with a normal switch. All of the bruises were deep, not superficial. He found quite a lot of hemorrhage in the body of the child other than in the brain. The bruise on the chest and the one on the head went down to the bone. One of the bruises on her head was directly over the hemorrhage in the cranial vault. The wounds and the bruises on the child's body were all fresh ones and showed no signs of healing.

W. D. Browning, a detective of the Atlanta Police Department, testified: He assisted in making an investigation of the death of Janie May Marshall, who died at the home of her foster parents in Fulton County, Georgia. He and his investigating partner were called to Grady Hospital about 2:45 a. m. on September 27, 1953. He observed bruises over the whole area of her body and also deep lacerations on her cheek and head. From the hospital, he and his partner went to the home of the accused and found a doll or child's chair in the living room, the back part of which had been freshly broken and the part which had been broken off was near the chair on the floor. By the chair and on the wall, about two or three feet above the floor, there were several spots which looked like blood, covering an area of about two or three feet square. There were also blood spots on the bed in the front bedroom. A television set was in the living room. Previously, and while at the hospital, the accused told him and his partner that she had whipped the child on frequent occasions. In that statement she said the child was unruly, was bad about getting into things in the house, and was bad about messing up the walls of her new home. She said the cut in the

cheek was caused by the child falling against the television. She told them later, when they were questioning her about the bruises, that the child had fallen down four or five steps. She said the child was her husband's niece whom they had taken to raise after the death of her mother. Neither the television nor the wall around it had blood spots on it. The defendant's husband told them he worked on the night of the child's death and arrived home around midnight or later. The next day at the jail, the defendant made another statement, freely and voluntarily, in which she said she first discovered the child was sick when the child woke her up snoring loudly as if in a deep sleep. She said that she was unable to awaken the child and went to the back bedroom where her husband slept, woke him up, and told him that there was something wrong with the child, and that he then went to a neighbor's house to get assistance in taking the child to the hospital, it being then around 1:30 or 2 a. m.

Dr. Herman Jones, Director of the Georgia Crime Laboratory, testified: He examined a small chair which came from the home of the accused and which was turned over to him by the City of Atlanta investigating officers. The back of the chair was broken with certain pieces out and the left upright piece was loose in the chair. There was human blood on nine areas of the chair, two of which were on the back of the chair. The blood on the chair was sprayed over it in such a way as to indicate to him that it struck the chair with considerable force. It could not, in his opinion, have been so sprayed on the chair by dropping from a wound on a person.

Lena Akin testified: The back of her house is at the back of the defendant's house. Before the defendant moved where she now lives, she lived in a duplex house with her. On September 27, the husband of the defendant came to her home at 1:55 a. m. and requested her and her husband to come over to his home, as Janie May was sick and he believed she was unconscious. She reached the home of the defendant at 2:05 a. m. and found the child on the bed. The defendant then said that the child had fallen out of the door. The child was then cold and stiff. She wrapped the child up in a housecoat and carried her to the hospital in a cab. She had never seen the defendant whip the child, but had heard her whip her. The whippings she heard would

jar her side of the duplex house, but she did not know with what she was whipping her. She could hear the defendant tell the child to hush while she was whipping her. Sometimes the whippings lasted from five to ten minutes, and she would then stop and in about five minutes start again. She had seen the chair the officers got at the defendant's home, but had never noticed it being broken until the night of the child's death. The whippings did not sound like switch whipping to her because of the jar accompanying them, but they sounded more like the child was being thrown against the wall or on the floor.

Elsie Powell testified that she lived across the street from the defendant. She heard the defendant whipping the child in May before its death in September. On one occasion when the child was playing on the sidewalk, she asked the defendant why the child was so scarred up, and she first stated that she had fallen and then said, "I whipped her; I tried to kill her that time."

Nannie Jones testified: She was a close neighbor of the defendant and her husband. She went to bed about 12:30 a. m. on September 27. She had been in bed about an hour when she heard a terrible noise which came from the direction of the defendant's home. She did not know what it was, but it was loud enough to awaken her and it sounded like something being thrown on the floor or against the wall. She could hear talking, but could not understand anything that was said. Soon after hearing the noise, she saw the defendant's husband leave his home and go in the direction of a neighbor's home.

The accused in her statement to the jury said: The child's chair had been broken since New Year's by the child and other children. The child often played with the chair and pushed it on the floor; she played with it on the afternoon before her death. The defendant went to get some water from another house during the afternoon before the child's death that night, and when she returned with the second container, she saw the child falling down a set of steps, four or five in number, but when she got to her, she was going back up the steps. The fall caused the bumps on the mouth and head of the child. The injury to her cheek was caused by striking her face against the television before she fell down the steps. Her husband came home about five or five-thirty before the child died during the

night. They went to bed about eight-thirty. She had given the child a laxative during the day, and about 12:30 or 1 o'clock, she woke her up and wanted to use a pot. She was up with her several times from then until 2 o'clock, when they again went back to bed and the child started saying that she was hurting somewhere. Her husband was then sitting in the living room. She picked the child up, put a bedspread around her and sat in the living room in a chair. At that time the child began to stretch. She put her face next to hers and seemed to say, "My head hurts"; then she stretched and the end came. She sent her husband to Lena Akin's home to get assistance in taking the child to the hospital, but their car was broken and it was necessary for them to go to the hospital in a cab, but the child was dead before they left home. She denied beating the child with any instrument which would produce the wounds found upon the child's body. She also said that she did not allow her husband to whip the child and that he had never done so but twice.