20465. LYLES *v.* THE STATE.

CANDLER, Justice. On June 10, 1959, a grand jury in Bibb County by a special presentment charged and accused Mrs. Anjette Donovan Lyles with the offense of murder. The presentment alleges that the accused "with malice aforethought, did, in the year of Our Lord One Thousand Nine Hundred and Fifty-Eight in the county aforesaid, make assaults upon Marcia Elaine Lyles by administering and causing to be administered to the said Marcia Elaine Lyles deadly poisons, to wit: Arsenic and arsenic trioxide, and other poisons of like deadly character the names of which are to the grand jury unknown, but all of the same being substances likely to produce death in the manner so used; the said An-

jette Donovan Lyles having administered said deadly poison and poisons by artfully, deceitfully, and wickedly enticing, procuring, and causing the said Marcia Elaine Lyles to swallow and take internally said deadly poisons at a time and times, and in a form and forms, and in a dose and doses to the grand jury unknown, all with the intention and design to kill and murder the said Marcia Elaine Lyles, who was then and there ignorant of the deadly character of said poisons; and the said deadly poison and poisons did produce in said Marcia Elaine Lyles a state of mortal sickness whereof she died on the 5th day of April in the year of Our Lord One Thousand Nine Hundred and Fifty-Eight, and so the jurors aforesaid, upon their oaths aforesaid, do say that the said Anjette Donovan Lyles, in the manner and form aforesaid, did unlawfully, feloniously, and with malice aforethought, kill, murder, and slay the said Marcia Elaine Lyles contrary to the laws of said State, the good order, peace and dignity thereof." Before arraignment, the defendant demurred to the presentment generally on the ground that its allegations are insufficient to charge her with the commission of any offense under the laws of this State. And she demurred to it specially on the ground that it alleges no specific date or dates on which she allegedly made assaults upon Marcia Elaine Lyles by administering and causing to be administered to her deadly poisons, and that there is no allegation in the presentment of any date on which the accused allegedly murdered Marcia Elaine Lyles. The demurrers were overruled, and that judgment is properly excepted to in the bill of exceptions. On the trial a jury convicted the accused of the offense charged without any recommendation, and she was sentenced to be electrocuted. In due time, she filed a motion for a new trial on the usual general grounds, later amended it by adding several special grounds, and excepted to a judgment denying her motion as amended. *Held:*

1. Section 27-701 of the Code of 1933 declares: "Every indictment or accusation of the grand jury shall be deemed sufficiently technical and correct which states the offense in the terms and language of this code, or so plainly that the nature of the offense charged may easily be understood by the jury . . ." This section gives a form for every indictment or accusation, and it is there pointed out that each indictment or accusation must set out the offense and allege the time and

place of its commission with sufficient certainty. The same form as there given has been included in all of our former Codes. The special demurrer, which the defendant timely interposed, attacks the presentment on the ground that it fails to allege a specific date on which the offense charged was allegedly committed by the accused. Respecting this contention, we think it is well settled by the decisions of this court that an indictment or accusation which fails to allege some specific date on which the offense was committed is defective as to form and therefore subject to a timely interposed special demurrer pointing out such defect. For some of the cases so holding, see *Cook* v. *State*, 11 *Ga.* 53 (56 Am. Dec. 410); *Harris* v. *State*, 58 *Ga.* 332; *Bailey* v. *State*, 65 *Ga.* 410; *Thomas* v. *State*, 71 *Ga.* 44; *Phillips* v. *State*, 86 *Ga.* 427 (12 S. E. 650); *Braddy* v. *State*, 102 *Ga.* 568 (27 S. E. 670); *Adkins* v. *State*, 103 *Ga.* 5 (29 S. E. 432); *Bridges* v. *State*, 103 *Ga.* 21 (29 S. E. 859). As to the cases just cited, *Thomas* v. *State* is the only one where the accused was charged with murder, and there the indictment alleged a specific date. In the instant case it is argued that the trial judge erred in overruling the defendant's special demurrer, and that the trial was nugatory. This contention is not sustainable. Concerning the essential allegation of time, the presentment which was returned by the grand jury on June 10, 1958, alleges in substance that the accused in 1958 administered and caused to be administered to Marcia Elaine Lyles deadly poisons, to wit: Arsenic and arsenic trioxide, with the intention and design to kill and murder her, and that the poisons so administered caused her death on April 5, 1958. Here is a day certain, "April 5, 1958", when the death of the person named in the presentment actually occurred, allegedly in consequence of the defendant's wrongful and unlawful acts. It was on that specific date the offense of murder, as charged in the presentment, was consummated by the accused, and the presentment alleges that every unlawful act which the accused performed in the commission of the homicide and which culminated in the victim's death was performed by her in 1958 before the presentment was returned and before the victim's death.

The presentment in this case was good in substance. It alleged all the essential elements of the crime of murder so plainly that the nature of the offense could be easily understood by

the jury; and, since it did, it was sufficiently technical and correct. See *Thomas* v. *State*, 71 *Ga.* 44, supra. This being true, the court did not err, as contended, in overruling the general demurrer interposed to the presentment.

2. On the trial several witnesses for the State were permitted to testify to facts showing or tending to show that the accused had previously poisoned and killed three other persons for monetary motives. Such testimony was objected to when offered on the ground that it was irrelevant, immaterial, and put the defendant's character in evidence when she had not elected to do so. Special grounds 1 to 55 inclusive of the motion for new trial allege that the court erred, over the objection made thereto, in allowing such evidence. Counsel for the plaintiff in error has argued these several grounds together, and correctly so, inasmuch as they present for decision one composite question which was raised many different times during the trial. This is certainly not a new question, but one which this court has had for consideration many times. By several full-bench decisions, and by some where there were one or more dissents, this court has affirmed convictions where testimony of the character here complained of was admitted over a similar objection timely made. Among the unanimous decisions just referred to, is *Williams* v. *State*, 152 *Ga.* 498, 521 (110 S. E. 286), where the defendant was indicted in Jasper County for the murder of one Lindsey Peterson, and where evidence, showing or tending to show that he had for the same asserted motive, namely, the destruction of evidence against himself and sons for the offense of peonage, previously murdered seven other persons, was admitted over timely objections thereto, it was held: "The general rule is, that, on a prosecution for a particular crime, evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent from that for which he is on trial, even though it be a crime of the same sort, is irrelevant and inadmissible; but to this rule there are several exceptions. Among them is the admissibility of evidence showing or tending to show the commission of crimes other than that for which the accused is on trial, for the purpose of showing motive, plan, or scheme." Some of the other full-bench decisions referred to are: *Hill* v. *State*, 148 *Ga.* 521 (1) (97 S. E. 442); *Coart* v. *State*, 156 *Ga.* 536 (119 S. E. 723); *Waters* v. *State*, 158 *Ga.* 510 (123

S. E. 806); *Green* v. *State,* 172 *Ga.* 635 (158 S. E. 285); *Wilson* v. *State,* 173 *Ga.* 275 (2) (160 S. E. 319); *Honea* v. *State,* 181 *Ga.* 40 (181 S. E. 416); *Cooper* v. *State,* 182 *Ga.* 42 (3) (184 S. E. 716, 104 A. L. R. 1309); *Sisk* v. *State,* 182 *Ga.* 448 (1) (185 S. E. 777); *Goodman* v. *State,* 184 *Ga.* 315 (191 S. E. 117); *Black* v. *State,* 187 *Ga.* 136 (199 S. E. 810); *Hunter* v. *State,* 188 *Ga.* 215 (3 S. E. 2d 729); *Mimbs* v. *State,* 189 *Ga.* 189 (5 S. E. 2d 770); and *Emmett* v. *State,* 195 *Ga.* 517 (25 S. E. 2d 9). None of these decisions has been overruled or modified, and until they are they have the force and effect of a statute and are binding authority which this court is required to and should follow. As authority for this, see *West* v. *Trotzier,* 185 *Ga.* 794, 796 (196 S. E. 902); *Hagan* v. *Candler,* 189 *Ga.* 250, 258 (5 S. E. 2d 739, 126 A. L. R. 108); and *Crown Laundry* v. *Burch,* 205 *Ga.* 211 (53 S. E. 2d 116). Some of the more recent decisions referred to, where there were one or more dissents, are *Gossett* v. *State,* 203 *Ga.* 692 (2) (48 S. E. 2d 71); *Dorsey* v. *State,* 204 *Ga.* 345 (49 S. E. 2d 886); *Biegun* v. *State,* 206 *Ga.* 618, 620 (58 S. E. 2d 149); and *Mosley* v. *State,* 211 *Ga.* 611 (87 S. E. 2d 314). On its facts, the *Gossett* case is remarkably similar to the instant case. Like the defendant in this case, Mrs. Gossett was indicted for killing one person with arsenic, money being her motive for the homicide as the State contended, and over her objections the court admitted evidence which showed or tended to show that she had previously killed her father and mother with arsenic for a monetary motive. It was there held by the majority that the evidence objected to was relevant for the purpose of showing plan, scheme, and motive with respect to the crime for which she was then being tried; and some of the full-bench decisions mentioned above were cited in the opinion which Mr. Justice Bell prepared for the court as authority for the ruling there made. The full-bench decision in *Bacon* v. *State,* 209 *Ga.* 261 (71 S. E. 2d 615), is not in conflict with the decision rendered in any one of the several cases cited above. It simply holds, as they do, that, on the trial of one charged with the commission of a crime, proof of a distinct, independent, and separate offense is not admissible, even though it be a crime of the same sort, unless there is some logical connection between the two from which it can be said that proof of the one tends to establish the other. In the instant case, the presentment accused the de-

fendant of intentionally killing her nine-year-old daughter by causing her to swallow and take internally certain deadly poisons. The State contended that her motive for such act was the collection of insurance which had been taken out on the life of the deceased in which she was the designated beneficiary, and certain other financial benefits which would accrue to her on the child's death. The State offered, and the court admitted over the defendant's objections, the testimony of a number of witnesses which shows or tends to show that the accused, for a money motive and in a like manner, had previously poisoned with arsenic and killed three other persons, namely Ben F. Lyles, Jr., Joe Neal Gabbert, and Mrs. Ben F. Lyles, Sr., the first two being her husbands and the latter her mother-in-law. The testimony objected to and allowed tends to show a logical connection between the deaths of the three persons mentioned by the witnesses and the death of Marcia Elaine Lyles, the last victim. Touching this and respecting similarity of the facts and circumstances as to the death of each, the evidence shows: (1) Each of the victims occupied a very close relationship to the defendant. (2) Each of them died from a unique cause: arsenic trioxide poisoning. (3) Each died from a remarkable administration of these unique media, that is, by multiple doses built up to a lethal level. (4) The defendant was the only close personal attendant to all four victims. (5) The defendant showed little or no grief for any one of her four victims, though each was very close to her. (6) The defendant collected a substantial amount of money from the death of each victim. (7) The burials of all were similar, in that each was lavishly done by the defendant. (8) All victims were carried to the same hospital, at which place they were attended by the defendant. (9) The defendant expressed intense dislike for each of the victims either before or after his or her death. (10) The defendant predicted the death of all of the victims except Ben F. Lyles, Jr., before he or she died. In addition to these general similarities, there are innumerable other similarities between various combinations of the deaths within the overall grouping. These similarities are obvious from a reading of the evidence and will not be enumerated here. We think that all of these facts and circumstances are sufficient to show that common design and modus operandi which brings this case within the scope of the rule so clearly stated in the

above-cited decisions. Hence, we hold that the evidence objected to was relevant for the purpose of showing plan, scheme, and motive with respect to the crime charged by the presentment in this case, and that the court did not err in admitting the evidence for such purpose.

3. The brief for the plaintiff in error argues special grounds 56 to 59 inclusive together. These special grounds complain of the introduction and allowance of several canceled checks, some of which are dated after the death of Marcia Elaine Lyles; a letter to the Veterans Administration, dated June 21, 1955, purporting to be written and signed by Joe Neal Gabbert, and inquiring about the status of his insurance; an instrument purporting to be signed by Mrs. Ben F. Lyles, Sr., dated September 2, 1957, addressed "To Whom It May Concern", and directing that her body be delivered for burial to Anjette Donovan Lyles (the defendant); and a photostatic copy of the last will and testament of Mrs. Ben Lyles, Sr. That they were irrelevant, immaterial, did not illustrate the issue on trial, and were being offered by the State solely for the purpose of putting her character in evidence when she had not elected to do so, was the objection timely made by the accused to their admission. None of these grounds of the motion requires a reversal of the judgment refusing a new trial. They were facts which it was proper for the jury to consider in connection with the State's contention that the accused murdered Ben F. Lyles, Jr., Joe Neal Gabbert, and Mrs. Ben F. Lyles, Sr., as well as the person named in the presentment; and that her motive for each homicide was the same, namely, money. Respecting all of the documents so tendered, except the canceled checks, the State introduced evidence which would have authorized the jury to find that they were not only forgeries but forged by the accused.

4. Special ground 60 alleges that a new trial should be granted movant because the jury which tried her was not sworn as required by law. The recital of fact in this ground of the motion for new trial was not approved as being true by the trial judge; but, to the contrary, was disapproved by him and his certificate expressly recites that the jury was sworn before the trial started. Hence, this ground of the motion cannot be considered. *Clifton* v. *State*, 187 *Ga.* 502 (2) (2 S. E. 2d 102).

5. The evidence, though circumstantial in nature, authorized

the verdict, and it has the approval of the trial judge. Hence the general grounds of the motion for a new trial are not meritorious. See *Gossett v. State*, 203 *Ga.* 692, supra, *Clements v. State*, 214 *Ga.* 569 (1) (105 S. E. 2d 725), *Driver v. State*, 194 *Ga.* 561 (22 S. E. 2d 83), and *McNaughton v. State*, 136 *Ga.* 600 (71 S. E. 1038), where each defendant was convicted on circumstantial evidence and where the indictments charged them with having committed a homicide by the intentional use of a deadly poison. Among the many facts and cirmustances shown by the State's evidence in the case at bar, which when considered together and as a whole show the defendant's guilt of the offense charged, is a statement made by her on more than one occasion shortly prior to the decedent's death that she would kill her if it were the last thing she ever did. The evidence as we view it after a careful and anxious examination of it, shows nothing short of a deliberate, premeditated, well-concocted plan and scheme, as the defendant thought, to murder an innocent child for no cause except to satisfy her selfish desire for money.

6. Since the judgments complained of are not erroneous for any reason assigned, they are therefore affirmed.

*All the Justices concur, except Wyatt, P. J., who dissents from the rulings in the second and third divisions of the opinion and from the judgment of affirmance.*

ARGUED MAY 11, 1959—DECIDED JULY 8, 1959—
REHEARING DENIED JULY 23, 1959.

*William K. Buffington, Jack J. Gautier, Roy B. Rhodenhiser, Jr.,* for plaintiff in error.

*H. T. O'Neal, Jr., Charles F. Adams,* Special Assistant Attorneys-General, *Eugene Cook,* Attorney-General, *Rubye G. Jackson,* Deputy Assistant Attorney-General, contra.

In substance, the State's evidence and the defendant's statement were as follows: The defendant married Ben F. Lyles, Jr., in 1947. Two children were born to them. His mother, Mrs. Ben F. Lyles, Sr., was very devoted to him. She lived with them or they with her much of the time. They operated a restaurant together. He was rated by the Woodmen of the World Life Insurance Society as a permanently disabled person on De-

cember 1, 1951. In January, 1952, he became seriously ill and was admitted to a hospital on January 23, 1952. When admitted, he was comatose, bleeding from the nose and mouth, had a generalized edema, hemorrhage in the conjunctiva of both eyes, was delirious, vomiting, and had a twitching of his extremities, accompanied by rapid respiration. He died on January 25, 1952. He had a G. I. insurance policy which named the defendant as beneficiary, and from which she received $9,300; two policies with the Woodmen of the World Life Insurance Society, from which she, as beneficiary, received $3,000. As his widow and from the time of his death, she received $150 per month from the Veterans Administration until her remarriage in June, 1955, and from the same source their two children received $47 each thereafter.

The family restaurant was sold after the death of Ben F. Lyles, Jr., but his mother continued to maintain a close association with his family. In April, 1955, the defendant acquired the original Lyles restaurant, and thereafter operated it as "Anjette's Restaurant." She met Joe Neal Gabbert the day she opened the restaurant. He was an airline pilot, 26 years old, weighed 200 pounds, and was six feet tall. Approximately three days before their marriage, he purportedly wrote a letter to the Veterans Administration about his insurance policy and inquired if it was still of force and if the premiums had been paid. An expert examiner of documents for the State Crime Laboratory testified that the letter was not written or signed by him. After their marriage during June, 1955, the defendant was made the beneficiary of this insurance, and on his death received $10,091.85 as payment of the policy. On August 2, 1955, he applied to the Metropolitan Life Insurance Company for insurance in the amount of $20,000, designating the defendant as beneficiary, but $10,000 of it was not accepted since the defendant thought they could not afford it. In November, 1955, Joe Neal Gabbert entered the hospital for a minor wrist operation. The defendant was at the hospital continuously administering to him various fluids and juices. Shortly after the operation, he developed a weeping rash over his body from which body fluids flowed out of the erupted skin. He suffered

terribly from this disorder and his face and eyes were bound up much of the time with bandages and wet dressings. Dr. Reifler, a dermatologist, as a witness for the State, testified that a rash such as he had could, in his opinion, be due to dermatitis caused from arsenic. An attorney, who was a patient at the hospital at the time, testified that the defendant told him she thought her husband should make a will and she would like for him to talk to her husband. He went to Gabbert's room to discuss it with him, but when he saw Gabbert's condition, he did not discuss the matter. A nurse at the hospital testified that the defendant asked her to look at Gabbert's feet and legs and see if they were not turning dark and she at that time stated to the witness that her husband was going to die. He was transferred back to the home where he and the defendant lived with her mother. His condition became so much worse that he could hardly do anything for himself, but he was not under a doctor's care. Miss Jennie Ingle, a registered nurse, cared for him one shift each day, and the defendant looked after him until she came on duty the next day. The nurse testified that she fed him intravenously until November 30, 1955, when his veins collapsed; that a doctor had not been called to see him during this time; and she informed the defendant that he would die unless a doctor was obtained to treat him. The next night, the defendant sent him by ambulance to the Veterans Hospital in Dublin, and the defendant followed the ambulance in her car, accompanied by a man not known to the witness. He was placed in a psychiatric ward where he died on the following day. During Mrs. Ingle's care of the deceased, the defendant made a number of statements to her concerning her relationship with him and his family, saying that his insurance was made to her, and his mother was not going to get any part of it; that she did not want his family coming to Georgia but, if they did, she should tell them that he received the best treatment available. Miss Ingle also testified that the doctor requested permission to do an autopsy, but the defendant refused until the doctor told her he could go over her head and obtain authority to do it. The defendant then became hysterical and stated that she had

promised her husband during a conversation they had before he got sick that she would never after his death consent to an autopsy. Gabbert was buried in Macon but, at the insistence of his parents, his body was subsequently exhumed and moved to Texas. Miss Ingle also testified that she met the defendant some time after Gabbert's death in Macon, driving a new car, and at that time she told the witness that she was in love with another man who had a good job and a big insurance policy. Two other witnesses testified that the defendant stated to them that she could not have continued to live with Gabbert if he had not died; that she did not love him; and that she would have divorced him had he continued in life. After Gabbert's death, the defendant changed her name back to Anjette Donovan Lyles by a proceeding filed for that purpose in the Superior Court of Bibb County.

Mrs. Ben F. Lyles, Sr., remained very close to the defendant and her children. She lived with them some of the time and helped to operate the restaurant and they lived with her some of the time. In the summer of 1957, the defendant attempted to purchase a white Oldsmobile convertible automobile from a dealer in Warner Robins, who told her that he would require a down payment of at least $1,000. She then stated to him that Mrs. Ben F. Lyles, Sr., was in the hospital seriously ill and she did not think she would live and in about a month she could pay the $1,000 or probably the full purchase price, since she and her children were beneficiaries under Mrs. Lyles' will. About thirty minutes before the onset of Mrs. Lyles' illness, she, the defendant, and some other people were at the defendant's restaurant together. The defendant left and about thirty minutes later Mrs. Lyles' face became discolored and she commenced vomiting blood. When informed of her illness, the defendant sent her maid to bring her to the defendant's home, where she remained until August 28, 1957, when she was removed to a hospital with symptoms of pigmentation of the skin and peripheral neuropathy, which prevents one from having the use of his or her extremities. Between the onset of Mrs. Lyles' illness and the time of her hospitalization, the defendant was seen in her restaurant with a bottle of Terro ant poison which she explained

to Mrs. Cleo Hutcheson, an employee, was to be used for the purpose of killing ants in her home. The defendant constantly looked after Mrs. Lyles and carried her food and liquids. One witness saw her get a glass half full of buttermilk, take it into the restroom at her restaurant, together with her black pocketbook, then come out and leave for the hospital with the milk and the pocketbook. Two or three days later she was seen taking some more milk into the restroom together with something in a small paper sack, which she had removed from an overnight bag. The nurse on duty with Mrs. Lyles testified that the defendant brought food and drinks to Mrs. Lyles: that Mrs. Lyles would not drink the coffee from the defendant's restaurant because she did not like the taste of it; that, just before Mrs. Lyles died, the defendant asked her several times how long it would be before Mrs. Lyles died; and that she showed grief respecting Mrs. Lyles only when others were present. Carrie Jackson, a former employee, testified that, shortly after Mrs. Lyles was taken to the hospital, the defendant carried food and liquids to her and stated to the witness that Mrs. Lyles was going to die. Mrs. Ingles testified that the defendant told her she hated Mrs. Lyles and wished she were dead, and that she had moved into the house with the defendant without an invitation. The defendant stayed at night with Mrs. Lyles at the hospital and kept her cosmetics, toothpaste, etc., in an overnight bag. An attorney testified that the defendant told him that Mrs. Lyles did not want to execute a will but she thought she ought to make one. One week after Mrs. Lyles entered the hospital, the defendant told a witness that Mrs. Lyles was going to die without leaving her anything, but that she knew an attorney who would make a will for her just as she wanted it made. Two weeks after the death of Mrs. Lyles, the defendant showed this witness an instrument dated August 20, 1957, which purported to be the will of Mrs. Lyles. Seven witnesses for the State testified that, on the day the will was purportedly signed and for many days before and after then, Mrs. Lyles was completely paralyzed—she could not pick up a glass, press a hospital buzzer, hold a straw or a pen. On September 2, 1957, a writing which authorized the defendant to take charge of the

body of Mrs. Lyles at the time of her death was taken to a notary public in the hospital by the defendant, who told her that Mrs. Lyles had signed it. The writing was witnessed by the notary and another person at the notary's request and placed in the hospital files. It authorized the defendant to claim Mrs. Lyles' body for burial, and was returned to her when the body of Mrs. Lyles was delivered to her. An expert examiner of documents for the State Crime Laboratory testified that the purported will of Mrs. Lyles and the burial instrument were both forgeries and made by aid of tracing paper. Tracing paper was found by the investigating officers in the home of the defendant. Mrs. Lyles died on September 29, 1957, and her purported will was probated. The will named the defendant as sole executrix and bequeathed two-thirds of the decedent's estate to the defendant and her two daughters. After the death of Mrs. Lyles, the defendant, as executrix of her estate, deposited in different Macon banks $11,197.32 as funds of the estate. A sister of Mrs. Lyles testified that she visited Mrs. Lyles while she was in the hospital, and Mrs. Lyles gave her bonds amounting to $2,500, which she then had in her purse. The defendant became very angry with the nurse on duty when she discovered the bonds were missing. An attorney of the Macon Bar testified that, some time prior to the death of Mrs. Lyles, the defendant showed him deposit books on two different Federal Savings Banks in Atlanta or Decatur in Mrs. Lyles' name showing balances of between $80,000 and $90,000; and other witnesses for the State testified likewise, but the State was unable to produce further evidence respecting such deposits.

Soon after Mrs. Lyles' death, the defendant began to abuse her nine-year-old daughter Marcia Elaine Lyles. Witnesses for the State testified that she, in speaking to the child, said: "You little Lyles-looking son of a bitch, I'll kill you if it's the last thing I ever do." She repeated this threat on another occasion and at the same time said that she would have killed her previously except for Carla—the younger daughter—crying and praying for her. On another occasion when she threatened to kill Marcia and cursed her for a "Lyles-looking son of a bitch," Mrs. Cleo Hutcheson remonstrated with her and told her that

she did not mean it. "Yes," said the defendant, "I mean every word of it. I will kill her if it's the last thing I ever do." On Sunday, March 2, 1958, between 6 and 6:30 p.m., the defendant and Marcia came into the restaurant and the child was coughing, complaining of feeling bad and suffering from headache. She went to the back booth of the restaurant and "draped" her head over it. The defendant and some of her friends were in the kitchen of the restaurant. The child begged her mother to take her home, continued to complain about being sick and, according to the testimony of several witnesses, appeared to be very sick—she was coughing constantly and had a high temperature. The defendant took a spoonful of sugar, poured whisky over it, and gave it to the child. About 8 p.m., the child commenced vomiting violently and the defendant carried her home. She was hospitalized on March 5 and placed in the same room which Ben F. Lyles, Jr., Joe Neal Gabbert, and Mrs. Ben F. Lyles, Sr., had previously occupied. The defendant stated to witnesses on Wednesday or Thursday of that week that Marcia was going to die. A few days after the child became ill, the defendant sent for some grape juice, poured some of it into another cup, went in the restroom of her restaurant with the cup and her pocketbook, and came out shortly with the juice and carried it to the hospital. About March 5, as three witnesses testified, they saw the defendant squeeze two lemons into a glass, take the glass and her black pocketbook into the restroom, come out shortly, stir the liquid, smell it, and touch it to her own lips, and one of those witnesses testified that she went with her to the hospital where she gave the liquid to the child. These witnesses testified that, where the liquid touched the defendant's lips, sores and a rash appeared a day or two later, and one of them testified that they were "parched up." The personal maid of the defendant, who was one of these witnesses, was instructed by the defendant about two weeks later to change the contents of the same black pocketbook into her brown pocketbook, and the defendant at that time had Terro ant poison as a part of its contents. The defendant, on seeing that the witness noticed this, gave her as an explanation for its presence that there were ants at her restaurant. The maid testified that she then took the

defendant, who was in possession of the brown pocketbook containing the poison, to see her child in the hospital. The State introduced uncontroverted evidence which showed that the defendant had since September, 1957, had a contract with a pest-control company to exterminate any vermin at her home or at her restaurant, and that the company made monthly checks of her premises, and had never found ants at either place, and a call to the company complaining of ants would have been answered promptly without additional cost to the defendant. A nurse on duty with the child testified that, about two weeks after the child was hospitalized, the defendant brought some lemon juice to the child and said she "meant for her to drink it." The child became violently ill immediately after drinking the lemon juice and vomited frequently. An employee at the restaurant testified that she went with the defendant to the hospital to take the child some food and tea; that the defendant while they were en route to the hospital requested her to go in a drug store and get the child a toothbrush; that the child did not want to drink the tea because she said it did not taste good; that, after the death of the child, the defendant told the witness that her maid had found the children playing "doctor and nurse" with Terro ant poison. One nurse testified that the defendant asked her to look at Marcia's knees, and told her the child was going to die. Another nurse attending the child testified that the defendant tried to call a named man in California from the hospital several times. After the child's death, she called the defendant about paying her account for services, and the defendant told her that the maid had informed her that her child had taken ant poison and liked it because it was sweet and that her other child, Carla, was going to drink some of it so she could die and go to heaven with Marcia. After the child's death, the defendant's maid found four bottles of Terro ant poison in her bedroom. Dr. Charles Ireland testified that he was called in on the child's case on March 12. He noticed a decided improvement in her condition about March 26, but the defendant told him that her improvement could not last and that she would get worse. Two weeks before the child died, the defendant predicted her death and told two witnesses that the child

wanted to see them; the witnesses testified that the child did not appear to them to be very sick at that time. The defendant on one day predicted that the child would die by 2 a.m. the next morning, and completely emptied her hospital room, including the flowers. She also gave her bathrobe to a cousin. During the night the child begged to be taken home, and the defendant turned to the nurse and remarked, "It won't be many minutes now, will it?" On March 22, 1958, the defendant ordered a special casket for her and planned for the children's choir at her church to sing at her funeral. The child was plagued with abnormally forceful vomiting, suffered nasal and oral bleeding, and contracted a generalized edema, her kidneys began to function badly and sometimes not at all. These conditions were accompanied by delusions. She would complain of beasts coming after her, insects attacking her, and of worms crawling out of her fingers; she would clutch at anyone standing near, cling to them, and beg to be protected. When the defendant was there on these occasions, she would act as if the child's delusions were comical and would laugh at what she said. After the death of the child on April 5, 1958, the defendant showed no signs of grief.

Dr. Leonard Campbell, pathologist and Bibb County Medical examiner, made a gross material autopsy two hours after the child's death, which consisted of a visual inspection of tissue and revealed nothing. After the child's death, one of the employees in the defendant's restaurant became suspicious of the defendant's actions, and wrote an anonymous letter to one of Marcia's aunts. The letter was subsequently passed on to the Coroner of Bibb County before the funeral. The coroner contacted Dr. Campbell, who performed a second autopsy. He removed tissue from the liver and the kidneys and parts of her hair which he transmitted to the State Crime Laboratory in Atlanta for the purpose of ascertaining the existence of poison. With these specimens he also forwarded two bottles of Terro ant poison. A few days later, the defendant visited Dr. Campbell's office for the purpose of discussing the child's death and subsequently made several visits. She was informed of the anonymous letter accusing her of poisoning her child and of the second autopsy. She showed no reaction whatsoever when advised that she was

suspected of poisoning her child, and no specific poison was mentioned. The next day the defendant called Dr. Campbell and told him of an occurrence which she wanted her younger child Carla to relate to him. The defendant brought two bottles of Terro ant poison in a paper sack and had Carla relate a story about playing doctor with the Jones' twins with the poison bottles. Dr. Campbell insisted that the defendant should call the mother of the twins and tell her about the incident. She picked up his telephone book, looked up a number and dialed it, telling the party on the other end of the line that she was in the doctor's office and feared the twins had come in contact with some arsenic poison. The mother of the Jones' twins testified that her name was not listed in the telephone directory, and that the defendant had not called her. The evidence showed that the call was actually made to the defendant's home and received by her maid. She called Dr. Campbell at another time and told him about a letter which would clear her—a letter written to her by Mrs. Ben F. Lyles, Sr., addressed to her as "Anjette," and that the letter admitted that she (Mrs. Lyles) was responsible for the death of her son, Ben F. Lyles, Jr., and for her own approaching death and begged forgiveness for the wrong she had done to her (the defendant). She told two other witnesses about the purported letter from Mrs. Lyles. An expert examiner of documents from the State Crime Laboratory testified that a tracing of the letter found in the defendant's home and introduced in evidence was a forgery and explained the way it was prepared by the accused.

Hoke Smith, an embalmer and funeral director, testified that he embalmed the bodies of Joe Neal Gabbert, Mrs. Ben F. Lyles, Sr., and Marcia Elaine Lyles; and that the embalming fluid did not contain arsenic, and arsenic had not been used in embalming fluid since the Pure Food and Drug Act was passed, and it could not have been legally used in 1950, or since then.

The defendant was arrested and charged with murder while she was being hospitalized for phlebitis. Miss Della West was one of the guards while she was at the hospital. The defendant told her that she had all the "brass hats" in Macon behind her and would easily get the whole matter straightened out; that

she had not received one cent out of any of the deaths; and that she was in possession of a letter from Mrs. Ben F. Lyles, Sr., which would clear her—a letter which her maid had found in a slit in the lining of one of Mrs. Lyles' pocketbooks; that the policies in question should pay her double indemnity on the lives of the persons she was accused of killing if she were cleared of the crimes. Her maid testified that the defendant told her she was to say she had found this purported letter from Mrs. Lyles in a slit in one of Mrs. Lyles' pocketbooks, when in fact she had not found it at all. There was testimony as to the financial transactions of the defendant and the overdue notes, which the State contended formed the background for the money motive running through the child's poisoning. The assistant chief criminal investigator of the sheriff's office testified that the defendant told him she had received $48,750 out of the four deaths being investigated; that he found an advertisement of Terro ant poison in her bedroom; three almost-empty bottles of Terro ant poison in her kitchen cabinet; and that he found a brown pocketbook which, among other things, contained another used bottle of Terro ant poison.

Dr. Larry Howard, toxicologist at the State Crime Laboratory, testified that he analyzed the tissues received from the body of Marcia Elaine Lyles, and found them to contain arsenic at levels sufficient to cause death in a human being; and that there were multiple administrations of arsenic given and a large quantity of it had been given to her within four days of her death. He testified: that he had examined the hospital records and found quite a few symptoms indicating arsenic poisoning, and those records further confirmed his analysis of the tissues examined; that he was present when the bodies of Ben F. Lyles, Jr., Mrs. Ben F. Lyles, Sr., and Joe Neal Gabbert were exhumed and he removed certain organs such as the liver, kidneys, fingernails, stomach, and hair from each body for analysis; that tests were later made on these organs and, based on his analysis of them, it was his opinion that each died from multiple doses of arsenic poisoning. He also testified that Terro ant poison is a clear liquid substance, is colorless, and has a sweetish taste. It is an arsenic trioxide compound and measures out at .91 per cent arsenic.

Dr. Richard Ford, Professor of Legal Medicine at Harvard Medical School and Chief Medical Examiner for the Massachusetts State Police, was introduced by the State as an expert witness on toxicology. He testified that arsenic was classified as a heavy metal poison; that it will produce death when taken in sufficient quantities; that it is virtually incapable of detection by the average medical doctor unless he has been put on notice that he is dealing with arsenic poisoning; that it is known as the "great imitator" since it produces symptoms which are very similar to many other diseases; that it acts slowly and is highly adaptable to being administered in repeated small doses, since the human body tends to store arsenic because it is excreted more slowly than it is absorbed with the consequential result that small doses can be administered over a long period of time and the body stores them until a fatal level is attained. A single big dose frequently causes vomiting and the dose is lost. A skilled toxicologist can readily determine whether or not repeated doses of arsenic have been administered by comparing the level of arsenic in the hair and fingernails to that in the liver and kidneys. Where the hair and nails have a comparatively high ratio to that in the liver, it is absolute proof that arsenic has been administered over a long period of time since it passes through the liver relatively fast while its storage in the hair and nails is slow. Arsenic is virtually indestructible and can be detected in a human body for many years and can be accurately located and measured as long as there is enough of the human body or tissue to analyze. Arsenic does not continue to destroy tissues after death. Based on Dr. Howard's analysis and the hospital records, he testified that in his opinion the death of Marcia Elaine Lyles was due to repeated administration of sub-lethal building up to a fatal dosage with an arsenic compound; that it is most probable that Mrs. Ben F. Lyles, Sr., died as a result of prolonged intake of an arsenic compound; that Joe Neal Gabbert died as a result of extraordinary dosage of arsenic necessarily given over a long period of time; and that Ben F. Lyles, Jr., died as a result of arsenic poisoning in multiple doses. This witness also testified that arsenic is no longer used as a medicine.

The defendant in her statement denied administering poison to anyone and denied taking any liquid at any time into the restroom of her restaurant. She denied that there were any poison bottles in her home when she left it. She told of her married life with Ben F. Lyles, Jr., that he was ill, a heavy drinker, and kept drinking more whisky until he died. She told of meeting and marrying Joe Neal Gabbert, and stated he had a rash when they were married; that he wanted to take out $20,000 insurance in addition to his National Service Life Insurance policy, but she told him they could not afford it; that they had agreed that, if either of them died, an autopsy would not be permitted; that, while he was ill in her home, Dr. Johnson saw him almost daily, but he could not get him back into the local hospital since he had trouble there with a nurse. She stayed at night with Mrs. Lyles while she was in the hospital and took buttermilk to her at her request. She stated that she took lemonade and grape juice to Marcia Elaine Lyles while Marcia was in the hospital; that one of the doctors had told her about ten days before the child's death that she could hardly live through the afternoon or early part of the night; that there was only $1,750 insurance on the child's life; and that her illness and funeral expenses cost her $4,700; that, after Marcia's death, her younger child stated that Marcia drank some poison. She stated she loved her children, although she did become irritated with them at times. She denied giving poison to anyone.